IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EXPRESS PACKAGING OF OH, INC., | ) | CASE NO. 5:09 CV 2318 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| v. | ) | |
| | ) | |
| AMERICAN STATES INSURANCE | ) | **MEMORANDUM OPINION &** |
| COMPANY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## Introduction

Before me[1] are cross-motions for summary judgment[2] in this diversity case.  Plaintiff Express Packaging of Ohio, Inc. claims that its insurer, defendant American States Insurance Company breached its duty to defend and indemnify Express Packaging under the terms of a commercial general liability insurance policy.[3]  The parties have each filed memoranda in opposition to the other's motion for summary judgment,[4] and both parties have filed replies

---

[1] The parties have consented to my jurisdiction.  ECF # 11.

[2] *See*, ECF # 36 (motion for summary judgment by defendant American States Ins. Co.); ECF # 37 (motion for summary judgment by plaintiff Express Packaging of Ohio, Inc.).

[3] ECF # 26 (second amended complaint).

[4] ECF # 38 (opposition filed by American States); ECF # 39 (opposition filed by Express Packaging).

to that opposition.[5]  In addition, I conducted a hearing on the cross-motions for summary judgment.[6]  Moreover, the parties have jointly filed stipulated facts and exhibits.[7]

Accordingly, for the reasons that follow, I will find that no genuine issue of material fact exists, and I can decide motions as a matter of law.  Further, on the basis of the non-disputed facts, the relevant terms of the policy and the holdings of Ohio law, I grant American States' motion for summary judgment and deny the motion of Express Packaging.

## Facts

### A.    Background facts

The essential background facts are straightforward and stipulated.  The dispute here arose in 2008 when cans of dog food packaged by Express Packaging for Mars Petcare US were damaged by a knife blade attached to a conveyor belt.[8]  As a consequence, the dog food in the damaged cans became contaminated, thus requiring that it be destroyed.[9]  Mars sought $241, 524 from Express Packaging for the loss.[10]  Express Packaging then filed a claim for

---

[5] ECF # 40 (reply by American States); ECF # 41 (reply by Express Packaging).

[6] ECF # 43.

[7] ECF # 35; ECF # 44 (supplement to stipulation).

[8] ECF # 35 (joint stipulation) at ¶¶ 6-13.

[9] *Id*. at ¶ 15.

[10] *Id*.

coverage under its insurance policy with American States,[11] which the insurer denied.[12]  After that denial of coverage, Express Packaging settled Mars's claim against it for the full amount sought,[13] and the present action ensued.

**B.     The insurance policy**

The policy at issue here is also not in dispute.

Initially, the policy provides in relevant part:

1.     Insuring Agreement.

a.     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . . We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

"Occurrence" is later defined in Part V – Definitions, paragraph 13 of the Policy, which provides:  "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Express Packaging further contends that no policy exclusion applies.

American States, in response,  asserts that there is no coverage and that, even if there was coverage under Section 1 of the Policy, this claim is barred by any one of six exclusions set forth in Part I – Coverages, Paragraph 2 – Exclusions.  These exclusions are:

---

[11] *Id.* at ¶ 19.

[12] *Id.*

[13] *Id.* at ¶ 20.

j.     Damage to Property:
       "property damage" to:
       ...
       (4)    Personal Property in the care, custody or control of the insured.
       ...
       (6)    That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
       ...
       Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

k.     Damage to your Product:
       "Property damage" to "your product" arising out of it or any part of it.

l.     Damage to your Work:
       "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

m.     Damage to Impaired Property or Property Not Physically Injured:
       "Property Damage" to "impaired property or property that has not been physically injured, arising out of:
       (1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work," or
       (2)    . . .

n.     Recall of Products, Work or Impaired Property:
       Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
       (1) "Your Product";
       (2) "Your Work"; or
       (3) "Impaired property";

       If such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

# Analysis

## A.     Standard of review – summary judgment

Summary judgment is appropriate where the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[14]  The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.[15]

A fact is "material" only if its resolution will affect the outcome of the lawsuit.[16]  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.[17]  The court will view the summary judgment motion "in the light most favorable to the party opposing the motion."[18]

---

[14] Fed. R. Civ. P. 56(c).

[15] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)).

[16] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[17] *Id.* at 252.

[18] *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.[19]  Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[20]  Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.[21]

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover.[22]  The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury."[23]  "In other words, the movant can challenge the opposing party to 'put up or shut up' on a critical issue."[24]

In sum, proper summary judgment analysis entails the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any

---

[19] *McDonald v. Petree*, 409 F.3d 724, 727 (6th Cir. 2005) (citing *Celotex Corp.*, 477 U.S. at 322).

[20] *Leadbetter v. Gilley*, 385 F.3d 683, 689 (6th Cir. 2004) (quoting *Anderson*, 477 U.S. at 248-49).

[21] *Anderson*, 477 U.S. at 249-50 (citation omitted).

[22] *Id.* at 256.

[23] *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

[24] *BDT Prods. v. Lexmark Int'l*, 124 F. App'x 329, 331 (6th Cir. 2005).

genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[25]

## B.    Standard of review – choice of law in diversity action

A federal court deciding a matter under its diversity jurisdiction applies federal law to procedural issues and the law of the forum state to substantive questions.[26]  When applying the substantive law of the forum state, the federal diversity court must follow the decisions of the state's highest court when that court has addressed the relevant issue.[27]  If the state's highest court has not directly addressed that issue, the federal diversity court must anticipate how the relevant state court would act.[28]  Decisions from intermediate state appellate courts are viewed as persuasive unless it is demonstrated that the state's highest court would decide the matter differently.[29]

In the particular instance of enforcing a contract in a diversity action, the federal court will generally enforce the parties' contractual choice of governing law.[30]  If the contract has

---

[25] *Anderson*, 477 U.S. at 250.

[26] *City of Cleveland v. Ameriquest Mortgage Secs., Inc.*, 615 F.3d 496, 502 (6th Cir. 2010) (citations omitted).

[27] *Id.* (citation omitted).

[28] *Id.* (citation omitted).

[29] *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005) (citation omitted).

[30] *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citations omitted).

no enforceable choice of law provision, the federal diversity court employs the choice of law analysis of the forum state.[31]

## C.  Application of standards

### 1.  *Ohio law applies in interpreting the Policy.*

Here, the parties have stipulated that because the relevant policy was issued in Ohio to an Ohio-based insured, Ohio law applies in construing its terms and provisions.[32]  Thus, in accord with the rubric that a federal diversity court should generally enforce the parties' choice of law, I will analyze the policy under Ohio law.

### 2.  *The occurrence here is within the scope of coverage of the Policy.*

An insurance policy is a contract subject to a number of principles that govern the interpretation and application of its terms.  In *Cincinnati Insurance Company v. CPS Holdings, Inc.*,[33] the Supreme Court of Ohio reiterated the well recognized principles that interpretation of an insurance policy is a matter of law and that a court must give effect to the intent of the parties, which is presumably reflected in the policy terms.  Thus, a court applying Ohio law should look to the plain and ordinary meaning of the policy language unless another meaning "is clearly apparent from the contents of the policy."[34]  If the terms

---

[31] *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citation omitted).

[32] ECF # 35 at ¶ 3.

[33] *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St. 3d 306, 875 N.E.2d 31 (2007).

[34] *Id.*, 115 Ohio St. 3d at 307-08, 875 N.E.2d at 34 (citations omitted).

are clear, the court may look no further and, if unambiguous, the term must be given its legal meaning.[35]  As the Ohio Supreme Court has stated:  "[A] contract is unambiguous if it can be given a definite legal meaning."[36]

The parties agree that:  (1) Express Packaging is an insured, (2) the occurrence took place during the relevant "policy period," and (3) was within the "coverage territory."[37] Whether there is coverage, without consideration of any business risk exclusions, is based upon whether there has been a covered "occurrence."  Under the applicable policy terms and in consideration of the stipulations, the issue becomes:  Has there been an occurrence that has harmed property as these terms are defined in the policy?  The answer depends on whether there was "an accident" that caused harm to "personal property."[38]

In *Erie Insurance Exchange v. Colony Development Corporation*,[39] the Ohio appeals court focused on the duty to defend where the insured building contractor had allegedly caused property damage through the design and construction of a condominium complex.

---

[35] *Id.* (citation omitted).

[36] *Id.* (citation omitted).  *See also*, *Andersen v. Highland House Co.*, 93 Ohio St. 3d 547, 549, 757 N.E.2d 329, 332 (2001), recognizing that insurance is a contract and like any contract is to be given "a reasonable construction in conformity with the *intention of the parties* as gathered from the ordinary and commonly understood meaning of the language employed."  *And see*, Restatement (Second) of Contracts § 211, cmt. f (1981), quoted in *Andersen* in regard to a customer's "reasonable expectations."  *Id.*, 93 Ohio St. 3d at 550, 757 N.E.2d at 333.

[37] ECF # 35 (stipulations) at ¶¶ 4, 7, and 13.

[38] *See*, *id.*, Attach. 1 (Policy) at Part V, Definitions, ¶ 13.

[39] *Erie Ins. Exch. v. Colony Dev. Corp.*, 136 Ohio App. 3d 406, 736 N.E.2d 941 (1999)

The policy in that case, similar to the one issued by American States, covered property damage "caused by an occurrence," defined as "an accident, including continuous or repeated exposure to the same general, harmful conditions."[40]  The court held that the allegations of property damage, even though allegedly the result of negligence,  were within the coverage provisions of the policy because, "In its common, ordinary use, the word 'accidental' means unexpected, as well as unintended."[41]  The *Erie Insurance Exchange* court also recognized that although a damages claim might fall within a standard exclusion of such policies, this does not render the coverage provision inapplicable as there may be aspects of the loss that remain within its terms.

In *Hybud Equipment Corporation v. Sphere Drake Insurance Company, Ltd.*, the claim was for property damage arising from pollution caused by the seepage from a landfill over a twelve-year period.  The lower courts determined that coverage existed under the terms of applicable comprehensive general liability insurance provisions and that a pollution exclusion did not apply.  The Ohio Supreme Court reversed these decisions based on the pollution exclusion, which it viewed as outcome determinative.[42]  The Court distinguished between the term "sudden and accidental" as used in the exclusion and the language of

---

[40] *Id.*, 136 Ohio App. 3d at 414, 736 N.E.2d at 947.

[41] *Id.*, quoting  *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St. 3d 657, 666, 597 N.E.2d 1096, 1102 (1992).

[42] *Hybud Equip.*, 64 Ohio St. 3d at 661, 597 N.E.2d at 1099.

"accidental" as found in the typical policy definition of an "occurrence."[43]  In the Supreme Court's view, the distinction was that an "unexpected and unintended" event is an "occurrence," whereas the term "sudden" adds a temporal element to the pollution exclusion requiring that an occurrence must also be "quick" or "abrupt."[44]

Here, the damage to the Mars pet food cans took place over a time span of July 17 to September 9, 2008.[45]  It is not disputed that the damage was unexpected and unintended. This occurrence presents a classic and clear meaning of "accidental," which is well within the definition of "occurrence."  Consistent with the facts and reasoning in *Hybud Equipment*, the loss sustained by American States is a covered loss.  As the Ohio Supreme Court recognized:

> "[T]he typical definition of 'occurrence' in an insurance policy is an accident that results in injury or damage which the insured did not intend or expect. . . . it does not matter whether the accident happened quickly or gradually; it would still be considered an 'occurrence' if it resulted in bodily injury or property damage."[46]

---

[43] The court in *Hybud Equip.* made clear that this view of occurrence was correct even though, as specified in note 1 of that opinion ". . . the parties have not raised the question of the proper interpretation of 'occurrence'" and recognized that the many decisions on this point involved policy language similar to that of the subject policy.  *Hybud Equip.*, *supra*, 64 Ohio St. 3d at 663, 597 N.E.2d at 1100.  I note that the court in *Hybud Equip.* relied extensively on cases such as *Waste Mgt. of Carolinas v. Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374 (1986).

[44] *Hybud Equip.*, 64 Ohio St. 3d at 664, 597 N.E.2d at 1101.

[45] ECF # 35 (stipulations) at  ¶ 7.

[46] *Hybud Equip. Corp.*, *supra*, 64 Ohio St. 3d at 666, 697 N.E.2d at 1102-03.

The Mars pet food cans were damaged by the cutters being used by Express Packaging to remove the plastic covering of their container boxes so that the cans could be repackaged. Express Packaging did not negligently manufacture these cans even if its negligence in removing the container coverings caused damage to them. Express Packaging asserts that the absence of "collateral property damage" requires a finding that there was no insured "occurrence."[47]

Even if I were to accept the need for "collateral property damage" as seen in *Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Company*,[48] the assertion that damage to the cans was not collateral property damage to the work performed by Express Packaging defies both law and common sense. The work performed by Express Packaging involved opening cartons and transferring the contents of those contents to new cartons – the variety packaging. As such, this case significantly differs from cases such as *Environmental*

---

[47] American States recognizes that only "some" Ohio courts require such collateral property damage to find the existence of an "occurrence" while "others" reject this position. *See*, ECF # 36 (Defendant's Motion for Summary Judgment) at 5-6. This claim is largely dependent upon the assertion that the damage was to "your Product." This, too, is a flawed position. The only element of the Policy definition arguably applicable is that goods or products were "handled" by Express Packaging. Consistent with the intent of the policy the better approach to the interpretation of "handled" was well expressed in *American Home Assurance Co. v. Cat Tech, L.L.C.*, 717 F. Supp. 2d 672 (S.D. Texas, 2010), which adopted the Webster's Dictionary definition of "to buy and sell; to deal, or trade in" as more appropriate than the alternative definition of "to touch." *Id.*, at 688 (citations omitted).

[48] *Hamilton Die Cast, Inc. v. United States Fidelity & Guar. Co.*, 508 F.2d 417 (6th Cir. 1975).

*Exploration Co. v. Bituminous Fire & Marine Insurance Company*,[49] where there was no collateral damage because the insured's work was to weld a pipeline. The insured's welding process was flawed so that a defective weld allowed natural gas to leak causing a rupture in the line with no damage to other property. Here, the work was performed on the cartons as distinct from the cans. The cans and their contents were other property. Accordingly, the damage to them constitutes collateral property damage.

At the very least, the principle of *contra preferentum* requires that where two interpretations are possible, and the one offered by the insured is reasonable, that interpretation shall be followed. In *King v. Nationwide Insurance Company*,[50] the Ohio Supreme Court states: "[I]t is well settled that where provisions of a contract are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." If the definition of "occurrence" were to be interpreted as American States argues to include a requirement of collateral property damage, essentially a judicial rewrite of the express Policy language, the result would be to deprive Express Packaging of coverage. To the extent that this definition depends on incorporation of the broadest possible meaning of "your product," the result would be to deprive Express Packaging of all coverage in any case where there was incidental touching of the damaged property involved.

---

[49] *Environmental Exploration Co. v. Bituminous Fire & Marine Ins. Co.*, 2000 WL 1608908 (Ohio Ct. App. Oct. 16, 2000).

[50] *King v. Nationwide Ins. Co.*, 35 Ohio St. 3d 209, 211, 519 N.E.2d 1380, 1383 (1988).

-13-

The exclusion would become the coverage rule thereby negating the reasonable expectation of the insured in contradiction of the long recognized principle that:

> In the interpretation of an agreement or a term thereof the following standards of preference are generally available:
>
> (a)    An interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect.[51]

American States interpretation of "occurrence" provides precisely this form of unreasonable meaning to the Policy.  Therefore, I find that the Policy section I, 1(a) provides initial coverage to the loss sustained by Express Packaging.

### 3.    *Coverage is excluded by exclusion j(6) of the policy*

Ohio law recognizes that business risk exclusions, consistent with the overall purpose of commercial general liability policies, prevent the policy from making the insurer a guarantor so that the policy does not take on the attributes of a performance bond.[52]

In *Andersen v. Highland House Company*,[53] the Supreme Court of Ohio recognized the need for strict interpretation of an insurance policy when dealing with exclusions: "[W]here exceptions ... are introduced into an insurance contract, a general presumption arises to the effect that that which is not *clearly excluded* from the operation of such a

---

[51] Restatement (Second) of Contracts § 203 (1981).

[52] *See generally*, *e.g.*, *Environmental Exploration Co.*, 2000 WL 1608908, at *6; *Erie Ins. Exch.*, 136 Ohio App. 3d at 406, 736 N.E.2d at 948, and cases cited therein.

[53] *Andersen*, 93 Ohio St. 3d at 549, 757 N.E.2d at 332.

-14-

contract is included in the operation thereof."[54]  Therefore, *Andersen* continued, "in order to defeat coverage 'the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can be fairly placed on the language in question."[55]

In this case the application of each exclusion asserted as controlling by American States is dependent on the meaning of one or more of four terms:  "care, custody and control" (exclusion j(4)), "your work"(exclusions j(6), l, m, and n), "your product" (exclusions k, m, and n), and "impaired property" (exclusions m and n).  Although colorable arguments for and against application of exclusions j(4), k, l, m, and n can be made, it is not necessary to rule on these exclusions because exclusion j(6) is clear and unambiguous.  This exclusion allows for only one reasonable interpretation when read in conjunction with the definition of "your work."  Application of this exclusion comports with the recognized rule that exclusions apply only "to that which is clearly intended to be excluded."[56]

Exclusion j(6) precludes coverage for property that must be "restored, repaired or replaced because 'your work' was incorrectly performed on it."

"Your work"

(a)    Means:
        (1)    Work or operations performed by you or on your behalf;: and

---

[54] *Id.* (emphasis in the original).

[55] *Id.* (internal citation omitted).

[56] *Hybud Equip.*, 64 Ohio St. 3d at 665.  *Accord*, *Andersen*, *supra*.

-15-

        (2)      Materials, parts or equipment furnished in connection with such work or operations.

(b) Includes:  . . .

(Policy) at Section V (22).[57]

Paragraphs 4 through 16 of the stipulations establish that Express Packaging qualifies as an insured under the subject policy.[58]  Express Packaging was under contract to repackage cartons of dog food for its customer, Mars.[59]  The work entailed the use of a table it owned and designed, fitted with cutters on each side.  The cutters were used to remove a plastic overlay after which the 24 cans in each carton were repackaged into consumer-ready variety packaging.  These variety packs were then sealed with a plastic wrap identifying the product and containing other advertising information.[60]  Under a staffing agreement, 1st Class Staffing, LLC provided the persons who did the variety packaging under the direct control of Express Packaging's supervisory personnel.[61]

This work did not include opening any of the canned product, or other alteration or modification of the actual cans of prepared dog food as received from Mars.[62]  As noted, a quantity of the cans had been damaged – they had been nicked by the cutters.  The damage

---

[57] ECF # 35, Attach 1.

[58] ECF # 35 at ¶¶ 4-16.

[59] *Id.* at ¶¶ 6-7.

[60] *Id.* at ¶ 8.

[61] *Id.* at ¶ 11.

[62] *Id.* at ¶ 12.

-16-

allowed air to enter those cans causing the contents to spoil, rupture, and permeate through the wrapped packages.[63]  Mars then recalled and inspected approximately 821,424 cases of the dog food.[64]  Other than the damage to the dog food, no other damage took place and no one other than Mars sustained any damage as a result of the cans being nicked.[65]

These facts establish that property of Express Packaging's customer, Mars, had to be "restored, repaired or replaced" because "your work"– the work or operations performed by Express Packaging or on its behalf (by 1st Class Staffing LLC) – was incorrectly performed. The damage to the cans, the nicking, took place during their repackaging and was made by equipment owned by Express Packaging.  The negligent "work" performed by Express Packaging was the proximate cause of damage to the cans.

Express Packaging's primary arguments are essentially that its work was limited to repackaging and had nothing to do with the dog food cans other than taking the steps necessary to remove them from the cartons they arrived and place them into variety packaging.  Its argument, in brief, is that its work had nothing to do with the cans as such so that the "it" reference ending the exclusion has to apply only to the work itself.  This approach is inconsistent with the intent and purpose of the exclusion.  To ignore damage caused directly by the work performed so as to assert that the exclusion applies only, for

---

[63] *Id.* at ¶ 13.

[64] *Id.* at ¶ 15.

[65] *Id.* at ¶ 16.

example, to adding the wrong plastic overlay to the variety packages is an unreasonable and unwarranted conclusion.

a.      *Ohio authority*

In *LISN, Inc. v. Commercial Union Insurance Companies*,[66] the insured was removing obsolete cable from a facility and accidently cut a live cable causing the facility owner to incur repair and replacement costs.  The Ohio appeals court affirmed summary judgment for the carrier because the applicable business risk exclusion, j(6), identical to that at issue herein, was unambiguous and excluded coverage.  The exclusion was applied because: "When LISN failed to protect the functioning cable and cut the functioning cable, LISN's work was incorrectly performed and the damage done to the functioning cable was excluded under the plain and unambiguous provisions of sections 2(j)(6) and ...."[67]

The Ohio court more recently addressed the scope of exclusion j(6) in *Welfle, Inc. v. The Motorist Insurance Group*,[68] where Welfle removed asphalt from a bridge surface and set its milling machine incorrectly, damaging the underlying concrete deck.  Welfle, similar to Express Packaging, reimbursed the bridge owner (Medina County) for the harm sustained (cost of repair).  The court gave careful consideration to *Employers Mutual Casualty*

---

[66] *LISN, Inc. v. Commercial Union Ins. Cos.*, 83 Ohio App. 3d 625, 615 N.E.2d 650 (1992).

[67] *Id.*, 83 Ohio App. 3d at 630, 615 N.E.2d at 654.

[68] *Welfle, Inc. v. The Motorist Ins. Group*, 2007 WL 1174652 (Ohio Ct. App. Apr. 23, 2007).

*Company v. Pires*,[69] one of two decisions relied upon by Express Packaging, before determining that Welfle drew the wrong analogy from that decision.  The exclusion applied because "Welfle misused its rotomill while using it to remove asphalt from the bridge deck thereby damaging the bridge deck.  Accordingly, it damaged the bridge deck while working on it, and the cost of repairing the bridge deck is excluded by the j(6) exclusion."[70]

The analogy here is compelling.  Welfle removed asphalt on a bridge deck and accidently damaged an underlying structure.  Express Packaging accidentally damaged cans in cartons it reopened for purposes of repackaging those cans.  In both cases, the machine or tool used to perform the contracted for work caused the damage at issue.

Under the *Erie* Doctrine, the court of appeals decisions in *LISN* and *Welfle* are persuasive as to the law of Ohio on the proper application of the j(6) exclusion to the facts here, and I am aware of no Ohio Supreme Court decision to the contrary.  That exclusion, therefore, defeats coverage.

*b.*     *Non-Ohio authorities*

Express Packaging seeks to rely on the decision in *Eott Energy Pipeline Limited Partnership v. Hattiesburg Speedway, Inc.*,[71] a Mississippi federal district case, for the proposition that the j(6) exclusion does not defeat coverage.  In *Eott Energy*, an employee

---

[69] *Employers Mut. Cas. Co. v. Pires*, 723 A.2d 295 (R.I. 1999).

[70] *Welfle*, 2007 WL 1174652, at *3.

[71] *Eott Energy Pipeline Ltd. P'ship v. Hattiesburg Speedway*, 303 F. Supp. 2d 819 (S.D. Miss. 2004).

-19-

of a land owner insured struck an oil pipeline on the property while grading a road thereon. The court held the j(6) exclusion inapplicable because the pipeline was not property being worked on by the insured in grading the road.[72]

Although *Eott Energy* has doubtful applicability to my *Erie* analysis in this case, in light of the Ohio decision in *LISN* and *Welfle*, the Wisconsin Court of Appeals recently distinguished it in a context applicable here in *Camelot Development Group, LLC v. Jim Karrels Trucking Sand & Gravel, Inc.*[73] *Camelot Development Group* involved damage to drain tile done by the insurer excavator under contract to excavate and grade before construction of a building. The court agreed "with the circuit court that the drain tile [buried in a field] was intrinsically tied to '[t]hat particular part' of the property [the field] being worked on, thus ... precluding coverage for damages involving it."[74]

Again, the analogy to this matter is compelling. The cans were intrinsically tied to the cartons in which they were packed. *Eott Energy* and *Camelot Development*, therefore, support the application of the j(6) exclusion on these facts.

---

[72] *Id.* at 826.

[73] *Camelot Dev. Group, LLC v. Jim Karrels Trucking Sand & Gravel, Inc.*, 2009 WL 3756345 (Wis. Ct. App. Nov. 11, 2009) (links to this unpublished opinion can be found at 322 Wis. 2d 736, 778 N.W.2d 172).

[74] *Id.*, at *4.

-20-

## Conclusion

Accordingly, based on the foregoing analysis, American States' motion for summary judgment is granted.  Express Packaging's motion for summary judgment is denied.

IT IS SO ORDERED.


Dated:   June 30, 2011                                    s/ William H. Baughman, Jr.
                                                                    United States Magistrate Judge